Good morning, Tracy Dressner for Petitioner and Appellant Lawrence Conway. Counsel, I have a question. We're all so steeped in the common law notion that you can't introduce prior bad acts to show propensity, that I guess a lawyer assumes that you just can't do that. But there's this footnote in a Supreme Court decision, Estelle v. McGuire, Justice O'Connor's opinion that intrigued me. She said, because we need not reach the issue, we express no opinion on whether a state law would violate the due process clause if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. I understood that footnote to mean it's not settled constitutional law that it violates due process. All it is is violation of evidentiary rules. Since under 2254, you need violation of the Constitution. It's a gap. I have several responses to that. I do agree that Estelle, that the United States Supreme Court did say that in Estelle v. McGuire, and that this Court in subsequent cases, Larson and Albarrini, I believe, have said that it's not clearly established law. My response to that would be that if you, while there is not one singular United States Supreme Court case that says that, that if you look at the host of cases, United States Supreme Court cases discussing the parameters of due process, and I cite those in my brief, in conjunction with the reasoning that's used in the old Chief Prosecutor's case, which talks extensively about the harm from propensity, that that would be a reasonable, indeed compelling proposition to take in the capacity. I think your argument is good on what the law ought to be. But under 2254, the State court has to act clearly contrary to Federal constitutional law as determined by a holding of the Supreme Court. So I don't know if we can use implications of old Chief Prosecutor's. Well, I don't know that it's ever been established that it has to be one, just from one court. I would put this as a bit vague. I think it was in Musladen. It would be — oh, I don't want to hear that. I think it's a reasonable argument to make, but I would also suggest that this Court member has to reach that issue, or even reach the issue of whether the prior bad act should have been admitted for propensity, because this case can easily be resolved on the ineffective assistance of counsel claim, because what we have here is undisputed error. This evidence was not supposed to come in for identity, and this was a whodunit case. And despite the proxies of the other, is the IHC claim within the COA? Yes. That was actually the first issue. It was definitely. That's on page, I believe, one or two of the excerpts, page one of the excerpts, whether counsel regarded ineffective assistance by failing to object to the jury  Okay. So the failure of the COA, I don't — I don't — unfortunately, my version of the I have the docket sheet on page one of my excerpts. There's the docket sheet listing the two issues that were granted. Okay. Is the — I'm sorry, on page two of the excerpts. Is your — I'm having a little trouble being sure I understand exactly what the ineffective assistance claim is, because I understood it, what you are arguing, is that the ineffectiveness had to do with failing to object to the prior bad acts instruction to the extent that it allowed the prior bad acts to be used to show identity. Let me explain and then make sure then I think that we'll be on the same page. Okay. Thank you. There had been much objection to the prior bad acts coming in for any reason. So there was no ineffective assistance in failing to object to the prior acts coming in? No. The lawyer did, but it came out. He did that perfectly. What happened is there was a mistake. And the part — and I think everyone would concede that this was a mistake. Even the prosecutor argued she was never trying to get this prior bad acts in as identity, because identity is the strictest standard. It has to basically be a signature. There's no question the person who did A and B had to have done C because they're so similar. But for some inexplicable reason, it was added to the — it was not taken out of the They have a whole list of reasons that prior bad acts could come in. And then what you do is you cross out the ones that don't — aren't supposed to come in. And for some reason, prove identity was not removed. Trial counsel inexplicably failed to notice it, failed to object to it, whatever. So the jury was told four times in this case, four times, that those prior bad acts could be used to prove the identity that Mr. Conway was the person who committed the murders, which is really sheer propensity. And it was — Let me ask you about — oh, sorry. Go ahead. I'm sorry. I was just saying it wasn't, because it really was only supposed to come in for intent to kill or intent to rape, issues that really weren't contested. It was pretty clear that whoever committed this crime had intended to kill and probably had raped. But the real issue in the case was who was the perpetrator. Let me ask you about harmlessness. Why wasn't it harmless beyond a reasonable doubt, because this fellow, Conway's semen was found on her leg? Well, I think because there's no evidence of when that semen was deposited. You have evidence that semen can be — can stay within a body for 72 — up to 72 hours or more. On her leg. On her leg. This is a homeless — this is a transient homeless woman who cocaine — uses cocaine, had cocaine in her system, had been — So you're saying it might have been deposited on her leg in another sexual event weeks ago, and she just didn't want it? No, not weeks ago. It could have been earlier that day, the previous day. There's indication in the record that she was someone who perhaps exchanged sex for money or sex for drugs. Her boyfriend had offered to bring her up for some sexual activity earlier in the evening. It's not — the point isn't that it's possible. A jury could have said, hey, semen was there. He must be the person. Was the semen still alive? I noticed you mentioned 72 hours. That's how long it stays alive. Or was it dead? I don't know if they talked about it in terms of alive and dead. They talked about it as intact and that it could remain intact for 72 hours or longer. And then there was this evidence that there were some underpants that were in a — her body was in the front room, and the underpants were in the bedroom. And the underpants had her DNA and no semen. So the argument was that he must — the person who — whose semen was there must have been the person that killed her because there was no semen deposit on the underwear. But there's absolutely no evidence that that was one that she was wearing underwear between the time she might have had sex with Mr. Conway and the time she was killed. There was no evidence that that was the underwear that she was wearing. And I think, more importantly, there was a fire that was set after her death on a pile of clothing that was sitting next to her body. And the identity of that clothing, articles of clothing, what they were, was never identified. And — Was his semen found in her vagina? Yes, on her vagina and on her leg and, I believe, on a T-shirt. But again, the — not that this case should turn on one's level of hygiene, but we are talking a transient population living in a — But it kind of does. I mean, semen is about as good a signature as Conway could have left. It is. And so it kind of does turn on her hygiene. If she was the kind of woman who took a bath every evening, it would be about as solid proof as there could be. On the other hand, if she was a woman who didn't bathe for weeks on end, it really wouldn't prove much of anything. Well, we don't know the difference between every day and two weeks. The only evidence going to that was her daughter who said that she came — that she would come by her house and that she was relatively clean, but she hadn't seen her mom in two days. It's certainly in — How did she keep clean? No — I have no idea. And that was — my point was, I think it's — Your daughter said she'd seen her a couple days before and she was clean? She didn't describe her — what she looked like then. I believe her exact testimony was that she was relatively clean, and then she agreed with the prosecutor that she didn't come in filthy and smelly, I believe were the words. So she didn't stink when she saw — visited her daughter? Perhaps two days earlier. And it wasn't — it was a generic, she doesn't come and visit me in this state. It wasn't two days ago when I saw her, she was wearing this and she had — you know, her hair was combed or anything. It was nothing — it was a nonspecific testimony. And I think that we have to recognize that there is a segment of our population that doesn't bathe every day, that lives in filthy, feces-strewn, vacant houses and that engage in frequent sex and drug transactions. It's certainly possible — it's certainly possible that Mr. Conway raped her and killed her. It's certainly possible that Mr. Conway had sex with her, consensual or otherwise, at some time prior to her being killed. It's an open question. And when you add into that that he had two prior murder — two — he was involved in two prior deaths, one of which he agreed he had — was a murder, one which was later going to revisit as a murder, which unfortunately he said he had had sex with the woman that night in 1975, who was too intoxicated, really, to give — probably to give consent, which — and then in the second case, there actually was no evidence that Mr. Conway had sex with the girl that was murdered, the 15-year-old. She had semen in her vagina when she was found. It was never — it was not traced to Mr. Conway specifically. But when you sort of look at that constellation of those three of them, of those three incidents, it makes it more likely, gee, I bet Mr. Conway raped this woman and killed her because he's been involved in these other sexual and — and killing offenses previously. Kagan. Ginsburg. Let me ask you kind of a metaphysical question here on the harmlessness point. If the evidence comes in for identities, you say, I mean, it's — what it says is, well, Conway was the perpetrator, not — I've forgotten, you know — Co-hero, anyone else? Not anybody else, anyway. Why else does one introduce intent evidence or M.O. evidence than to say, yeah, but it was you who did it, not somebody else, because from what you've done in the past, we can infer that it was you who intended to do it, because you've intended to do the same thing before. Why, at some level, isn't it all the same? Well, and I agree with you in a sense. That's why in other cases you might be here arguing, hey, even though they didn't say identity, by bringing it for intent, of course the juror is naturally going to kind of infer. But the response to that is, well, jurors are told to follow the — follow their instructions, and you presume that jurors do what they're instructed to do. And the problem is, in this case, you have the jury actually instructed. You may use this to prove identity. And the harm wasn't just in a final instruction. The harm is really magnified in this case because the judge instructed them about that three times before all the prior bad acts witnesses testified. They were all grouped together at the end of the case. And they always do that. I mean, it's pretty evident that what the judge did is he just used the form. And the form uses the language of the rule and all the reasons why prior bad acts can come in. No. In my experience, no. Judges are and do and they're tasked with striking out those that don't apply. Oh, yeah. Oh, yeah. Otherwise, you can hear in these cases all the time, because especially with identity, because the reason that one is so particular is because really identity is the fancy name for propensity. This is a bad one. Not necessarily. If you have the — the rule doesn't say that prior bad acts can come in to show a similar modus operandi or pattern. It says that they can come in to show identity. And evidence with a similar modus operandi or pattern tends to prove identity if it's similar enough. If there's some oddity, for example, the criminal always leaves a candlestick on top of a dead person. That's kind of a signature. That really tends to prove that it's the same guy. Exactly. Here, you have a good argument that the crimes are not signature crimes. They're not that similar. And that's exactly why it was a problem. Because there was a certain amount of similarity. But there was a little bit of A and a little bit of B, but not — Yeah, but there was a lot of fire and ligature strangulation and the particular state of undress and close to the body and sex beforehand. I mean, there are a fair number of things that are pretty similar that are a little bizarre. I mean, to have two fires? I mean — Generically. But if you — I could go through each of the three and talk about how A and C may be similar and B and C may be similar and B and A may have some similarity, but all three of them together don't. Why don't you go down the list and state what the dissimilarities and similarities are? The — okay. For example, Lange, who is the victim in this case, and Gaines, who was the first — who was the woman in 1975 with the accidental death, and then Reed was the woman he admitted murdering. Gaines and Lange were both nude from the waist down, but Reed was wearing panties. Gaines had physical — I'm sorry. Lange had physical trauma. Gaines did not have physical trauma. Reed had some abrasions. Lange died from — Reed had broken bones in the neck. Reed had — well, Reed died of strangulation, and Lange died of strangulation. Gaines died of smoke inhalation. Lange had sperm that was identified as coming from Mr. Conway. Gaines had sperm that Mr. Conway acknowledged was his. Reed had sperm that was not — where the donor was not identified.  It was classified by law enforcement and fire officials as an accidental death. And then there was much more extensive trauma, basically, to Lange, and there was other oddities, like the matchstick stuck — the burned matchstick stuck in the anus, which was not present in anyone else. Is this murder the only one with torture? Yes. Right. If we accept that all that stuff is torture, yes. Gaines had no physical trauma, just the smoke inhalation. So he didn't torture the other two, or whoever murdered him didn't torture him? No. I believe Reed had — the girl had some abrasions, and he admitted that he had punched her a couple of times. But not the kind of — Lange had puncture marks. She had broken fingers. She had, like I said, the matchstick in the anus, and severe trauma to multiple parts of her body, and the strangulation, and the fire, which was much more excessive than found in any of the other two. At this point, the question isn't would we admit those acts for the purpose of showing identity, but rather, given the similarities, was it harmless to give the instruction, or was it so prejudicial that you undo it? I agree to an extent. I disagree that there's any question that this was ever permissibly intended to come in for identity. No, I understand that, but now we're looking backwards on it and have a different question to ask. Well, I guess I was concerned that this Court was now going to come back and say, well, we actually don't think it was ineffective not to object because it should have come in for identity when I don't think even the parties of the Court ever contemplated that. Well, I'm sure the Court didn't, but that's what happened. I mean, they came in. They came in for identity. I mean, that's so far as — that's the error. But, right, and I — And so then the question is, is that error prejudicial? That I agree. And that's where, again, if we look at the evidence, there's the semen, may or may not have been related to — Very imperfect testimony. But there is an eyewitness who did place him at the scene. He does, and he is a very imperfect eyewitness, as the Court noted. And even the prosecutor said, if this case turned on Mr. Brown's testimony, we wouldn't be here. So if you look at — if you look at that you have this very imperfect witness who did not come forward for five days, who for two days kept saying he wasn't there, wasn't involved, didn't know anything, and then finally comes up with the testimony that he gives, which has a lot of inconsistencies, but does identify Mr. Conway, it's only after he's been threatened by the police that people have put him present at the scene. So he's got his own legal worries, and he suddenly is identifying some other folks. In addition, he's taking medication that impairs his memory. And this is a man who, by his own acknowledgment, needs at least four or five beers when he wakes up in the morning just to function, and he was drunk at the time when the police interrogated him. So the question is, if the jury wasn't told you can consider these really horrendous crimes to show that Mr. Conway committed this murder, is there a reasonable probability that the verdict might have been different? Well, I'd say yes, because there's a lot of what ifs, what ifs. You know, when was the semen there? This is a dirty woman, went through all that. Is Mr. Brown believable? For a lot of reasons he's not believable. But, man, we were told by the judge four times that we can consider that if this guy who did these other things, we could use that to identify him. And I'll tell you, it's hard not to think that Mr. Conway must have done it because he was not a nice guy. Ms. Fresner, thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Deputy Attorney General Tom Schiff for Respondent. Let me ask counsel, I'm having trouble with two things that I need your help on. One is, considering that people, the limitations there are in how people can have sex, it didn't look like much of a signature crime to me. I mean, and the crimes didn't look all that similar to me. And I was struck by the degree of torture, the horror in this crime, and the relative lack of it in the other two. So I have trouble seeing that it tended to prove identity. I have trouble seeing where it's harmless because it looked like the kind of crime where a jury might just not be sure and think he probably did it. But the judge says to him, you can consider those crimes to prove identity. I don't see where they do. I actually don't see what they prove except that he's a bad guy. I'm not sure about harmlessness. I'm wondering if we're just forced to say one way or the other whether it's contrary to constitutional laws established by holding in the Supreme Court to introduce propensity evidence and allow a jury to consider it. Your Honor, hopefully, let me try to address it. The way this case came up to this Court, the way I read it, I don't believe the merits of the actual issues regarding the admission of the prior bad acts evidence and the related instructional error. I don't believe the merits of those issues are properly before this Court. And that's because in the Court's certificate of appealability The issue is technically ineffective assistance in failing to tell the judge to strike the word identity, isn't it? As to the second issue, which is before this Court, is whether there was ineffective assistance of counsel. That's correct, regarding the instruction. And as to that one What's the other one? There's an error in my excerpts of record. I don't seem to have the actual certificate. There is a minute order at the excerpts of page 1. And I do have the actual certificate here. And the language in the minute order is exactly the same as this certificate here. I don't know if it's appropriate to show it to the Court. All right. I've got page 1. Okay. And it's basically at the 12407 entry. And then it lists the following The third line down says to the following issues, number 1. Yeah, I've got that. I just don't have the actual minute order. And I don't know if the Court wants to look at this or not. And I do have the actual certificate. We'll let you know if we need any more. But so as to the ineffective assistance of counsel issue, one point that I want to make regarding instructions was that there was no ruling below by the trial court expressly admitting or rejecting it for purposes of identity. The prosecutor didn't introduce it. What else would you intend to prove? I know the word intent was mentioned, and it seemed obvious from the nature of the injuries that whoever did the act against this poor woman wasn't an accident. He was intending to torture, rape, and kill her. So I didn't see where intent was an issue or how the Tennessee cases tended to prove it. One response to that is that whenever a defendant enters in a not guilty plea, he puts everything into issue, and the prosecutor is required to prove intent, even if the prosecution has a lot of evidence. How did the Tennessee cases tend to prove what he intended to do decades later in California? Under California law, in order to prove intent, it's a lower degree of similarity between the prior bad acts evidence and the current crimes. And so there's no dispute below that the evidence was introduced to – properly introduced for those purposes of proving intent in common plan and scheme. Intent – exactly what intent? His intent to both rape the victim. He's charged with first-degree murder and also with raping the victim. Okay. How did the Tennessee crimes tend to show what he intended to do to this homeless woman? Well, the fact that he – that in his prior – in his prior – in his prior acts that he – the acts are similar and that he essentially admitted to raping both women, it does – it has a tendency and reason to show in the current case, which was some similarities that he had that same intent as well. And I think – I thought the issue of intent was raised because there was some possibility that Conway was going to argue lack of capacity. That – that is a possible issue. And another point here, too, is that here he was charged as an aider and abetter, and therefore it's – if he wasn't the actual person who struck the victim or if he wasn't the actual person who – well, his scheme intended to show the strong evidence that he was the actual person that raped her. But aside from those issues, the ultimate – and again, it brings me back to – just discussing the merits here. Here, again, this Court can't grant habeas relief on this claim as to the evidentiary unless there's a constitutional violation. And I don't think that that issue was properly before this Court. I do think that the district court ruled properly in finding that there was no constitutional violation. And if it – and I do – if this Court – if it comes to it, I do request the opportunity to present a full briefing on it. But as to the claim of evidentiary error and related instructional error, as the – under – as to the evidentiary claim under Levitt v. Obey, if there's a permissible inference, then there is no constitutional violation even under the law of this circuit. And here, there were permissible inferences for the evidence, which was to prove content in common plan and scheme. And as to the instructional issue, again, there – there has to be – there has to be a reasonable likelihood that the jurors applied the instruction in a way that violated the Constitution. Could you deal with harmlessness a little? Ordinarily, his semen on her leg would just wrap it up tight. But if she's really dirty and doesn't bathe regularly, it wouldn't. Yes. My intent here was really to hit on the harmless error issue first, but – and to discuss that at length. And here, again, just a couple points before I come – before I discuss the actual evidence. But first, in Fry v. Plyler, the United States Supreme Court made clear that on habeas review of a State court criminal judgment, that the only applicable standard is that set forth in Brecht v. Abrahamson, and that Chapman really has no applicability in – in circumstances like this case. And under – under Brecht, of course, the standard there is whether there's a – whether the errors had a substantial or injurious effect or influence on the judgment. And here, just a couple more things I want to point out about Brecht is that Brecht is a forgiving standard. It's a lenient standard. In Brecht itself, the United States Supreme Court set forth several reasons why a less stringent standard – less stringent than the standard of Chapman should apply. For example, they cited that – they stated that habeas is an extraordinary remedy, that States have an interest in finality and judgments that have survived a State's appellate and collateral process. Also, that States are the primary actor in enacting and enforcing criminal law, and Federal courts shouldn't intrude on that power. And for all those reasons, Brecht is a – is a forgiving standard. In Freiberg's plethora, the United States Supreme Court called it a more forgiving standard than Chapman. And I think – so again, in discussing specific evidence and the harms there, I think we need to look at it in that light of Brecht as a lenient standard. So here, the evidence of Petitioner's guilt and specifically his identity, it was overwhelming. And even Brecht itself – Okay. Lay down what's overwhelming. Okay. Here – So that we can decide if there's a substantial or injurious effect on the verdict. Here – yes, Your Honor. Here, there were – there's physical evidence of Petitioner's identity, including the sperm, which has been mentioned here and has been mentioned by counsel. I feel a little bit uncomfortable going so into depth, but it was in her vagina. It was on the back of her right leg, lower buttocks, and it was on her T-shirt. So you've got his identity. And in addition to – I mean, you've got a sperm tending to show his identity. And in addition to that, you've got his fingerprint on a beer can, which was found at the crime scene. I didn't understand the fingerprint. I thought kind of places where you see homeless people, you see a lot of old beer bottles and beer cans. Yes, but it – I'm sorry. I didn't understand why it mattered because he could have been drinking beer there any time. I think there's two very important parts about that beer can or several important parts about it. First, it places him at the crime scene. It also – that same type of beer was also found at – he was a co-defender at one point, but the trials were severed. So for lack of a better term, I'm going to call him co-assailant, co-assailant Michael Koger. His hotel room had that same type of beer. So his fingerprint was a petitioner's fingerprint on the beer can. So we know he's been there, but this places kind of a crash pad for homeless people, isn't it? Yes, it places him at the crime scene. It also connects him with the co-assailant. And in addition, the physical evidence, his fingerprint specifically and also the sperm, they corroborated the testimony of Ray Brown. I'm not going to argue that Brown was, you know, the best witness or a perfect witness. He had problems with his memory and other issues like that. But the important thing is that his testimony was corroborated by that physical evidence, by the sperm. Just because the prosecutor wasn't impressed with Brown doesn't mean the jury wasn't impressed with Brown. They might have decided Brown was a good guy who told the truth. And, of course, that would cut in favor of Jim. What else is there besides the sperm, the beer can, and Brown? In addition to Brown's testimony being corroborated by the physical evidence, it was also corroborated by the actual injuries to the victim, Brenda L. That's all corroboration for Brown. Right. So what else is there besides to show that Conway did it? Besides his sperm, beer can with his fingerprint, and Brown saying so. Those were, that essentially was the evidence of Petitioner's guilt. And, in addition, Brown's testimony was also, some portions of it were also corroborated by the testimony of the neighbor, Billy Harkey. He testified that he, at the time of the crimes, he overheard a loud, a male in a loud voice. That's all saying the prosecutor thought Brown was a poor witness, but, nevertheless, there was a lot of corroboration. Right. Even, what I was looking for is do you have something besides sperm, beer can, and Brown? Those are, that's. Okay, now on sperm. Do you have something that can show that the sperm was deposited at about the time of the crime, and that it wasn't just a woman that didn't bathe in sperms from a long time ago? There's two points that were pointed out by the lower courts. And first was there was a pair of her panties, which had her genetic markers. I'm sorry? It had her DNA. The panties are clearly hers because they had her DNA on it. As one of the experts that testified at trial said that, identified her genetic markers on those panties. And so you've got her panties without petitioner sperm. And so that was one strong indication that he left the sperm on her at the time of the crimes. The other point, too, is that Brenda L's daughter, Gina L, she testified that Brenda L bathed at her house. And I think counsel summarized the state of the evidence. Basically she wasn't, Gina L also essentially testified that she wasn't a dirty person. The daughter said she took a bath at her house, bathed, maybe a shower. She did say that she bathed regularly. I don't know whether she said she bathed the last time that she saw her prior to the crimes. But, again, we need to take a look at. If she bathed at her house, it would mean Conway had not had sex with her three days ago and it was semen from three days ago. Right. I think the important. That's why I'm asking. I think the testimony was that she saw her two days prior to the crime. And I don't, I'm sorry, I don't recall whether she testified she bathed at that particular time. You don't happen to recall the page number, do you, so I could see if she said she took a bath? Her statement about bathing was just a generalized statement. I think. There's no real reason to dwell on it. I mean, there's no possibility that she said that she actually took a shower when she was at her house. I don't recall that, and that's my recollection. But I think the important thing, again, here is that, again, we're under the Brecht standard, which is a lenient standard. And another thing, too, is that if it was just the sperm itself, it's not just the sperm itself. It's not just the fingerprint itself. It's not just Ray Brown's testimony itself. It's all of it together. And Brecht itself says that you have to look at the evidence as a whole. And another point here is that Brecht also, in interpreting Brecht, this Court has used the term that there has to be a reasonable probability that the error did not contribute to the verdicts. And I think at most here there might have been, again, a felon, I think, at most raises speculative possibilities but not a reasonable probability. And a couple points here, too, is that as to the, for example, the arguments about that there could have been, that a petitioner could have left a sperm at some point prior to the crimes but not at the time of the crimes in the 72-hour period before the crimes. There was no direct evidence, no direct testimony as to that point. It's basically speculation. And, again, the points brought out by the Court of Appeal below, that the presence of Rapani's without his sperm on it and also Gina, the victim's daughter's testimony, rebutted that speculation. And even here there's even speculative arguments about that, oh, the panties she wore at this time when she might have had sex with the petitioner in the period prior to the crimes, oh, those panties might have been burned, or she might not have been wearing panties at all. And, again, that's all speculation. And that's not enough to raise, to demonstrate a reasonable probability that the jury would have reached a different verdict. Was there any evidence of sex on another reasonably close occasion? There was no testimony that two had sex relations at any time, or that that petitioner and the victim specifically had any sexual relations whatsoever. That's not in the record. With Conway. Right. With Conway and ‑‑ I don't care about anyone else. Right. Right. And basically the defense presented evidence that Brenda's L's, Brenda L's boyfriend might have offered her for sex to co-appellant, I mean, I'm sorry, microculture, but there's nothing directly saying that petitioner and her in any way had any sort of sexual history or sexual relations. So, again, just two additional quick points regarding Brecht. And I came across these in preparing for oral argument. And it's basically the concurring and dissenting justices in Frey versus Plyler. They actually did apply a Brecht analysis in that case and found that there was harm. And two of the factors that they discussed I want to hit on briefly here. One is that in finding that there was prejudicial error under Brecht in that case, in Frey, the justices who did apply the Brecht standard noted that the jurors in that case struggled with the verdict. They noted that the deliberations in that case took about five weeks. And here the deliberations took about 12 hours. That's at the reporter's transcript pages 4084 to 86. That lists the times where the jury was deliberating. And my calculations are roughly 12 hours. That's not five weeks. Right. A lot of defense lawyers regard it as a triumph if they can keep them out for 12 hours. Aside from that, there was no juror questions or any indication in the record that the jurors struggled with the verdict. And the second point is that in Frey they noted that the nature of the error in that case, which was a chamber's error, a series of evidentiary errors which violated due process, they termed that, the exact term I think is a near presumption or a near conclusive presumption. Before you run out of time, does admission of propensity evidence violate the due process clause? No, it does not. And that's clear. I apologize. No, that's clear under Estelle that there is no. And I forget the other cases cited in the district court's order. There's at least another case which basically cites Estelle for that same proposition. But, again, here we don't have, we have, for lack of a better term, trial type errors. And there is no presumption, let alone a near conclusive presumption of harm and errors involved here. So those are the points I want to make regarding the harmless error issue. And, again, should it be, if it would be necessary to hit the merits, I do, again, would request a full opportunity to brief it. And, again, I didn't brief it because I didn't think it was properly encompassed within the certificate of appealability itself. But I think the district court's order itself lays out the reasons why those errors were not constitutional in magnitude. And unless the Court has questions, I'll submit. Okay. Thank you. I apologize for talking so long. I have 58 seconds. Well, no, you, okay. You're over time, so just nice and quick. Oh, I thought I had 58 seconds. Okay. The constitutional violation in this case that's at issue is not, it's an IAC claim. It's a Strickland claim. It's that trial counsel failed to object to an erroneous jury instruction. It doesn't have to do with whether that evidence was properly admitted or not. And the standard for prejudice is Strickland, not Brecht, although they're very similar. But in this Court, Hayes, in an en banc decision, said once you've reached Strickland, you don't go beyond that to Brecht. And so there's been a lot of focus on Brecht. It's really on the reasonable probability standard that's set out in Strickland. In terms of whether the issue of the admissibility of the evidence is before the Court, it's this anomalous proposition. The Court, this Court granted a COA on the harmless error issue. Subsequent to granting that COA, this Court, en banc in Francine, said when you have a situation such as this, where the district court presumed an error or assumed that there was an error and only went on to the harmless error, this Court not only has to look at whether the harmless error analysis was incorrect, but then has to go back and see whether the antecedent constitutional violation actually occurred. And so that's what has to be before this Court. You couldn't do that step. If it means that we then have to do further briefing on that, so be it that you can't say that we're limited to the harmless error because this Court says that's not enough, you need to go beyond that. My last two points, the thumbprint, the thumbprint, it was uncontested that he was living in that house, and so that thumbprint might be there. We really do know the record, so. Okay. And the very last thing is that there was no vaginal trauma. This was a woman who was brutally beaten, tortured. If the same person raped her, that killed her, you would have expected some kind of vaginal trauma. Thank you. Okay. Thank you, counsel. The matter just argued will be submitted.
judges: Hall, Rymer, Kleinfeld